IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| v. | * | CRIMINAL NO.  RDB-21-0338 |
| GLADSTONE NJOKEM, | * | |
| Defendant. | * | |

\* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM ORDER

Defendant Gladstone Njokem ("Njokem" or "Defendant") is one of three Defendants in this case and has been charged with five counts in an eleven-count Indictment alleging one count of conspiracy to commit wire fraud under 18 U.S.C. § 1349, three counts of wire fraud under 18 U.S.C. § 1343, and one count of aggravated identity theft under 18 U.S.C. § 1028A(a)(1), (c)(4), (c)(5).  (Indictment, ECF No. 1.)  Now pending is Defendant's Motion to Suppress Statements (ECF No. 37) made by him on February 4, 2021, to law enforcement agents. The Court has considered the Government's Opposition (ECF No. 41) and the Defendant's Reply (ECF No. 55). This Court held a motions hearing on November 21, 2022, and heard testimony from federal agent Joseph Zajac and Defendant Njokem on the matter. (ECF No. 58.)  For the reasons explained below, Defendant's Motion is **GRANTED**, and those statements made on February 4, 2021, shall be excluded at the trial of this case.

## BACKGROUND

Federal agents executed a search warrant, issued by Magistrate Judge Thomas M. DiGirolamo of this Court, "at a residence on which Mr. Njokem was a lessee" on February 4,

2021. (ECF No. 37 at 1.) The records surrounding the execution of the warrant, particularly of Defendant's interview during that search, are sparse. Accordingly, this Court heard oral testimony from federal agent Joseph Zajac and Defendant Njokem on November 21, 2022, to develop the factual record. (ECF No. 58.)[1] Consequently, the Court recorded the following facts surrounding the February 4, 2021, execution of a search warrant.[2]

At approximately 7:48am on February 4, 2021, nine federal agents and a City of Hyattsville police officer knocked on Njokem's apartment door and announced themselves with their guns drawn and fingers off the triggers. The Defendant answered the door and appeared "slightly confused." Defendant Njokem testified that upon answering the door, all of the agents' guns were pointed at him and two of the agents took off his coat and put him on the floor to handcuff him behind his back. The agents then pulled him off the ground and placed him against a wall at the entrance of the apartment while the remaining agents did a protective sweep of the one-bedroom unit. Agent Zajac testified that this sweep lasted five minutes long, and Njokem was then placed on the couch.

Njokem testified that during the search, one of the agents told him that they would make it easier for him to go about his business if he answered their questions. At some point shortly after that statement, Defendant's handcuffs were removed. The Defendant asked to use the bathroom, and the agents allowed him to do so once they conducted a thorough search of the bathroom. An agent was with Njokem at all times. After using the bathroom, the

---

[1] When referencing the testimony herein, the Court is unable to cite to the transcript of the motions proceedings because it is not yet available. Thus, to expedite the issuance of this opinion, the Court recites the witnesses' testimony based on its own detailed account of the hearing.
[2] By previous Memorandum Order, this Court deemed the search warrant was predicated on sufficient probable cause. (ECF No. 62.) Consequently, the validity of the underlying warrant is not at issue here.

Defendant returned to the couch. Agent Zajac then approached the Defendant and introduced himself. Agent Zajac testified that upon inquiry by Njokem, he told him that if he wanted to leave the apartment he could, but that he could not return to the apartment until the search warrant was fully executed – in other words, the Defendant had to either stay in the apartment or leave altogether, he could not come and go until the search was complete. Agent Zajac testified that the Defendant stayed in the apartment and "expressed willingness to interview." Njokem testified that he felt threatened by the number of agents in his one-bedroom apartment and that he wanted to cooperate because he was scared and did not want harm or to go to jail. The Defendant stated that he did not feel like he had a choice in deciding to answer the agents' questions.

Because the agents were still executing the search warrant, Agent Zajac and another federal agent accompanied the Defendant to his bedroom because the area was quiet and secluded from the search. Njokem sat on the bed and the two federal agents remained standing as there was no other seating available in the bedroom. The bedroom door was cracked, and the agents were masked because of the COVID-19 pandemic. The agents' weapons were visible in holsters affixed to the agents' bodies. The Defendant was not read his *Miranda* rights and was not told that he could stop the interview at any time.[3]

Agent Zajac recorded the interview on an audio recorder and began the interview by thanking the Defendant for his cooperation and stating that the interview was voluntary. The Defendant did not state or acknowledge that the interview was voluntary on his part. Agent Zajac maintained an even speaking tone. At some point during the interview, Agent Zajac

---

[3] *See Miranda* cited *infra* p. 5.

3

showed Njokem's bank records as an indication of Njokem's guilt. Partially through the interview, the Defendant asked the agents for their business cards so that he could contact them at a later date. Throughout the duration of the interview, the Defendant disclosed details about his internet usage and computer password, his emails, and he consented to a search of his vehicle. Upon completion of the interview, the Njokem asked the agents executing the search warrant if he could smoke a cigarette and he was told again that he could not leave and return to the premises until the search concluded.

Njokem has filed a Motion to Suppress (ECF No. 37) which seeks to exclude "all statements made by him on February 4, 2021, and all evidence obtained as a result of these statements." (ECF No. 37 at 2.) Njokem argues that he was not read his *Miranda* rights despite being held and interviewed in custody, and therefore his statements and the evidence obtained as a result of those statements "must also be suppressed as fruit of the poisonous tree." *Id.* In support, the Defendant analogizes the facts of this scenario to those this Court emphasized as pertinent in suppressing evidence in *United States v. Martin*, No. CR RDB-17-0069, 2018 WL 6606232, at *7 (D. Md. Dec. 17, 2018). The Government retorts that the Defendant agreed to a voluntary interview, thereby negating any custodial arguments. (ECF No. 41 at 2.)

## ANALYSIS

"The controlling burden of proof at suppression hearings should impose no greater burden than proof by a preponderance of the evidence." *United States v. Matlock*, 415 U.S. 164, 177-178 n.14 (1974) (burden of proof for voluntariness of consent to search is by preponderance of the evidence); *see also, e.g., Colorado v. Connelly*, 479 U.S. 157, 168-169 (1986) (preponderance of the evidence burden regarding waiver of *Miranda* rights); *Nix v. Williams*,

467 U.S. 431, 444-45 n.5 (1984) (preponderance of the evidence burden regarding inevitable discovery of evidence obtained by unlawful means); *Lego v. Twomey*, 404 U.S. 477, 489 (1972) (preponderance of the evidence burden regarding voluntariness of confession).[4]

The Fifth Amendment privilege against self-incrimination provides that "[n]o person ... shall be compelled in any criminal case to be a witness against himself." U.S. Const., amend. V. In *Miranda v. Arizona*, the Supreme Court established "procedural safeguards effective to secure the privilege against self-incrimination" as ensured by the Fifth Amendment when a defendant is subject to custodial interrogation. 384 U.S. 436, 444 (1966); *see also Dickerson v. United States*, 530 U.S. 428, 444 (2000) (reaffirming *Miranda* as "a constitutional rule."). "Before conducting a custodial interrogation of a suspect, law enforcement officials must inform the suspect that he has the right to remain silent, that his statements may be used against him at trial, and that he has the right to an attorney during questioning." *United States v. Wilder*, 304 F. Supp. 3d 464, 469 (D. Md. 2018).

The test for determining whether an individual is "in custody" for *Miranda* purposes is whether, under the totality of the circumstances, the "suspect's freedom of action is curtailed to a degree associated with formal arrest." *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984) (internal quotations omitted); *see also United States v. Parker*, 262 F.3d 415, 419 (4th Cir. 2001).

---

[4] The Government's Opposition avers that the burden of proof rests on "the party who seeks to suppress the evidence." (ECF No. 41 at 3.) In support, the Government cites to *United States v. Pollins*, 145 F. Supp. 3d 525, 538 (D. Md. 2015). In *Pollins*, Judge Quarles of this Court applied that burden of proof in ruling on evidence from an illegal search under the Fourth Amendment. As the Defendant appropriately highlights, the instant motion is distinguishable as it addresses the Defendant's Fifth Amendment privileges as explained in *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). Therefore, the Government's proposed burden of proof is presently inapplicable. As in *Martin*, this Court need not determine which party carries the burden because "the totality of the circumstances demonstrates that the Defendant was in custody at the time of the interrogation." *United States v. Martin*, No. CR RDB-17-0069, 2018 WL 6606232, at *8 n.13 (D. Md. Dec. 17, 2018).

5

This inquiry is an objective one, and asks whether "a reasonable man in the suspect's position would have understood his position" as being "in custody." *Berkemer*, 468 U.S. at 422. In other words, "the court considers whether a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave." *United States v. Hashime*, 734 F.3d 278, 282–83 (4th Cir. 2013) (internal quotation marks and citations omitted).

"Facts relevant to the custodial inquiry include, but are not limited to, the time, place and purpose of the encounter, the words used by the officer, the officer's tone of voice and general demeanor, the presence of multiple officers, the potential display of a weapon by an officer, and whether there was any physical contact between the officer and the defendant." *Hashime*, 734 F.3d at 283 (internal quotation marks and citations omitted); *see also United States v. Colonna*, 511 F.3d 431, 436 (4th Cir. 2007) (finding "coercive pressures" where house is "inundated" with agents, defendant guarded by an agent at all times, and defendant and occupants unable leave and reenter home). Although an encounter in the home may typically weigh against a custodial interview, where the police presence is so obvious and controlling, an interview in the home may be considered custodial. *See Hashime*, 734 F.3d at 284 (rejecting the argument that the home setting of the defendant's interrogation rendered it noncustodial where the defendant felt that he could not freely move through his house because there were officers "everywhere" telling him what to do, where to go, and where not to go); *see also United States v. Mittel-Carey*, 493 F.3d 36, 39–40 (1st Cir. 2007) ("While an interrogation in a defendant's residence, without more, certainly weighs against a finding of custody, ... the level of physical control the agents exercised ... weighs heavily in the opposite direction."); *Sprosty v. Buehler*, 79 F.3d 635, 641 (7th Cir. 1996) ("More important than the familiarity of the

6

surroundings where [the defendant] was being held is the degree to which the police dominated the scene.")

In *United States v. Martin*, this Court found that a defendant was in custody where the "facts demonstrate[d] that a reasonable person in the Defendant's position would have perceived a police dominated atmosphere before and during the interrogation." No. CR RDB-17-0069, 2018 WL 6606232, at *7 (D. Md. Dec. 17, 2018). There, this Court emphasized that the defendant was approached by SWAT agents with drawn guns, that other federal and state enforcement officers were present on the scene, that the defendant was handcuffed and placed on the ground, that the defendant was interrogated by three agents for four hours, confronted with incriminating evidence discovered on his property, and that the defendant was isolated from his partner during the interrogation. *Id.* This Court also noted that although the agents notified the defendant that "he was not under arrest, was free to leave, and that his participation was voluntary did not render his interrogation noncustodial." *Id.*

Under the totality of the circumstances in this case, Njokem's freedom of action was curtailed "to a degree associated with formal arrest" and he was thus in "in custody" for *Miranda* purposes. *Berkemer*, 468 U.S. at 422. Nine federal agents and one local police officer knocked on the Defendant's door before 8:00am with their guns drawn and pointed at the Defendant. The Defendant was then immediately searched, put on the floor, and put in handcuffs as those ten agents "inundated" his one-bedroom apartment. *Colonna*, 511 F.3d at 435 (defendant's "home was inundated with" officers during execution of search warrant). Njokem was unable to leave, and his every move was accompanied by an agent. The Defendant was made powerless, placed on his couch in handcuffs while the agents executed

7

their search. The Defendant had to be given permission to use the restroom and was closely monitored when he did so.

At some point while the Defendant was handcuffed, an agent told the Defendant that things would be easier for him if he answered questions and cooperated with the agents. The Defendant's handcuffs were removed thereafter just prior to the interview. At the time of the interview, the two interviewing agents remained standing while the Defendant sat. Although not dispositive, this arrangement made for another visible power dynamic. The eight remaining agents continued to search the Defendant's apartment while the interview was ongoing. A reasonable man in Njokem's position would have felt the "police dominated atmosphere before and during the interrogation." *Martin*, 2018 WL 6606232, at *7. Additionally, similar to the circumstances in *Martin*, Njokem was presented with incriminating evidence during the interrogation "which may certainly cause a reasonable person to feel compelled to cooperate with the police." *Id.*

The Government argues that because the interview took place during "normal daytime hours" within the Defendant's home, the agent spoke in a measured tone, and the interview only lasted for an hour, the interview was non-custodial. (ECF No. 41 at 5.) However, these circumstances cannot be viewed in a vacuum. Instead, this Court views the totality of the circumstances and finds that the Defendant was not, nor would a reasonable person have felt, free to leave the interrogation or his home. Despite being told the interview was voluntary, the Defendant himself never indicated that he was participating voluntarily, and even attempted to curtail the interrogation short when he asked for the agents' business cards perhaps so that he could provide information at a later time. Ultimately, considering the totality

of the circumstances, the Defendant was in "custody" during the interrogation, and he therefore should have been given his *Miranda* rights. Because the agents did not read the Defendant his *Miranda* rights before the custodial interrogation, Njokem's statements made in that interview, and evidence that flowed from those statements, are inadmissible at trial.

## CONCLUSION

Accordingly, IT IS, this <u>29th</u> day of <u>November, 2022</u>, hereby ORDERED that Defendant's Motion to Suppress Statements (ECF No. 37) is **GRANTED**.

_____/s/_____
Richard D. Bennett
United States District Judge